## JEENS *v.* WRIGHTSVILLE & TENNILLE RAILROAD CO.

A party can not impeach his own witness voluntarily called by him, unless he can show to the court that he has been entrapped by the witness by a previous contradictory statement.

(*a*) And where on the trial of a case a party thus offering a witness did so upon faith of testimony delivered by the witness on another trial and in another case, which was reduced to writing, in which the witness made statements contradictory to his present testimony, the party offering him in the last trial will not, on this basis, be permitted to attack the witness in an effort to impeach him.

(*b*) And where in such a case a party was allowed to offer witnesses for the purpose of impeachment, over objection of the opposite party on the ground that proper foundation had not been laid, and the testimony of the impeaching witnesses detailed statements made by the witness whom it was sought to impeach, different from his present testimony and relating to material things, the error in allowing such impeaching testimony is cause for a reversal.

(*c*) Nor is the proper foundation laid for the impeachment of one's own witness, where the basis is the testimony of third persons who heard the testimony of that witness given in another case relating to the same transaction. and contradictory to the testimony of the witness in the cause on trial. it not appearing that the witness by himself or

through others had communicated to the party offering him what the witness had testified on the former trial.

AUGUST 14, 1915.

Action for damages. Before A. R. Wright, judge pro hac vice. Washington superior court. June 27, 1914.

*E. W. Jordan* and *Hines & Jordan,* for plaintiff.

*Daley & Daley* and *J. E. Hyman,* for defendant.

HILL, J. Jennie Jeens sued the Wrightsville and Tennille Railroad Company for damages from the alleged tortious killing of her husband, Jim Jeens, at the intersection of a public-road crossing with the track of the defendant company while the deceased was attempting to drive his horse and buggy across the railroad track. The jury found for the defendant. A motion for new trial was overruled, and the plaintiff excepted.

The sixth ground of the plaintiff's amended motion for a new trial was as follows: "Because the court erred in permitting the defendant to impeach Will Daniel, a witness sworn in its behalf, under the facts herein stated. Judge Daley, the attorney for the defendant, stated that he had been entrapped by the witness on account of the testimony which was reported at the coroner's inquest, and asked to be allowed to impeach him, which the court permitted, over objection of plaintiff's counsel that the plaintiff could not impeach said witness, he being the witness of the defendant, under the facts stated by counsel for the defendant. The court permitted the defendant to impeach said witness on the following statement of Judge Daley, the attorney for the defendant, to wit: 'I also made the statement that I have been entrapped, and I make this statement in my place that I had his sworn testimony at the inquest, and I relied on him giving that same testimony; in addition to that, I had the other statement that he delivered here to these witnesses.' For the purpose of laying the foundation for this impeachment the court permitted Will Daniel to swear as follows: 'I was sworn at the coroner's inquest. I did not swear at the coroner's inquest that Jim Jeems was about sixty yards from the crossing when the engine blowed for the crossing. I swore that he was making for the railroad when the engine blew for the crossing, and I swore that I was about sixty yards from the crossing at the time he got hit. I swore that I was about sixty yards from the crossing, and that I

was running to him, waving my hand at him that way. He did not see me waving my hand, I don't suppose. I swore that I saw him driving upon the crossing, and the horse got on the track, and as the horse got on the track the horse stopped and the train struck him. I swore at the coroner's inquest that I went up to the train and found the engineer and fireman out in front of the engine, that the buggy was hung on the pilot, and that the body was partly broken up and partly on the ground. I swore that the engineer blowed for the crossing.' For the purpose of laying the foundation for said impeachment the court permitted Will Daniel, over objection of counsel for the plaintiff, to testify, as a witness for the defendant, as follows: 'I did not state in the presence of Carson Lanier that I told Jim Jeems not to leave until after the train had passed, as I saw the headlight coming, and that Jim said that he could beat it to the crossing and started off, and as soon as I heard the crash I said to the people that Jim had let the train run over him. I did not state in the presence of Mr. Carson Lanier that I told Jim Jeems not to leave. I swear that positively. I did not tell anybody yet, I ain't never said it, and I am at the first of it right now.' Because the court erred in permitting C. E. Lanier, who was sworn as a witness for the defendant, for the purpose of impeaching Will Daniel, a witness for the defendant, to testify as follows: 'I know Will Daniel. Will Daniel was present that night immediately after this accident occurred, and I heard him make some remarks about what he said to Jim Jeems. Immediately after the accident Will Daniel came up with a little child in his arms, apparently about two years old; and he came around in front of the engine, and he says, "Mr. Lanier, I told him not to come away from that house and not to leave the house until the train went by;" and he says, "He told me, 'I am going to cross that track in front of that train.'"" Counsel for the plaintiff objected to all of the foregoing evidence and to the effort of the defendant to impeach its own witness, said Will Daniel, on the ground that the defendant could not impeach said Will Daniel, its own witness, upon the ground that counsel for the defendant had been entrapped, under the facts therein stated, the same being all the facts upon which the court based its ruling permitting the impeachment of said witness by the defendant. Plaintiff alleges this ruling is error, and says that the

court should have sustained her objections to all of said impeaching testimony on the ground that the defendant had made no case, under said facts, which authorized the impeachment of its own witness."

The · common-law rule with respect to impeaching one's own witness was that it could not be done for the purpose of discrediting his testimony where the party producing him was dissatisfied with it. This rule rested on the theory that one producing a witness vouched for his credibility, and would not be heard to attack the veracity of his own witness and to destroy him if he testified against him, and to make him a good witness if he testified for him. 5 Jones' Com. on Ev. § 853. And the weight of authority is to the effect that in the absence of statutory authority a party will not be allowed to offer direct proof by other witnesses that his own witness has previously made statements inconsistent with his present testimony, or by proving general bad character for truth and veracity. Ibid. § 854. Selover v. Bryant, 54 Minn. 434 (56 N. W. 58, 21 L. R. A. 418, and note, 40 Am. St. R. 349). But our statute modifies this rule of the common law, and declares that "A party may not impeach a witness voluntarily called by him, except where he can show to the court that he has been entrapped by the witness by a previous contradictory statement." Civil Code, § 5879. See 40 Cyc. 2694. This statute, being in derogation of the common law, must be construed strictly. The statute uses the word "entrapped," not "misled," as used in some jurisdictions. A party may be misled, but not entrapped. Under our statute, he must be entrapped. We find no definition of the word "entrapped" by the legal lexicographers, but the New Standard Dictionary thus defines it: "To take or catch in a trap; entangle or take captive by trick or artifice; insnare; as, to entrap a bird." We do not incline to the too narrow definition that the witness must have *intentionally* made statements intended to deceive and entrap in order to testify, though, if he does so, we think this is within the statute; but if a witness makes a statement to a party litigant or his counsel, or to some third person with instruction to communicate such statement to the party or his counsel, which is done, and the party acts on that statement, we think in legal contemplation the party has been *entrapped,* and the rule laid down in the statute would apply

in such a case. But we also think that "the information as to the prior inconsistent statement must have come to the party or his counsel directly from the witness." 40 Cyc. 2694, citing *Luke* v. *Cannon*, 4 *Ga. App.* 538, 541 (62 S. E. 110). It is not a sufficient foundation for impeachment that third persons testify that the witness whom it is sought to impeach made contradictory statements on the trial of a former and different case from his present testimony. We do not think that the fact that the witness has testified previously in another case to inconsistent facts, which testimony was reduced to writing, and which defendant's counsel has relied on as a basis for using the witness as his own in another case, without communicating with the witness in order to ascertain what he knows of the facts, is a sufficient basis for impeaching his own witness, where he has offered him as such without any interrogation as to his knowledge of the transaction testified about. The least diligence on this line would have probably discovered whether the defendant would need the witness as its own. But it can not be the rule that a party can rely on testimony given in another case, though as to the same transaction, unless the witness delivering it has in some way "entrapped" the party offering him. We do not think the proper foundation was laid by the defendant for the impeachment of its own witness; and the court erred in permitting the defendant to thus attack or impeach him.

The issues of the case were fully presented to the jury by the charge of the court, and none of the other assignments of error require a reversal.

*Judgment reversed. All the Justices concur, except Evans, P. J., disqualified.*