## 30306. WILSON v. THE STATE.

HALL, Justice.

On this appeal from Wilson's conviction of murder and armed robbery, the foremost issue is whether the trial court erred in allowing the district attorney to impeach his own witness Pickall by introducing Pickall's prior inconsistent statement, when Pickall's testimony had not damaged the state's case save by failing to bolster it as hoped. We find that there is a conflict in the applicable Georgia cases interpreting the controlling statute, Code Ann. § 38-1801. This impeachment was not permissible under certain of these cases; however, that result has no sound supporting reason, and is not dictated by the terms of Code Ann. § 38-1801. Accordingly, we will no longer follow those cases disallowing impeachment on these facts.

Wilson was tried alone for the murder and armed robbery of James Olin Hammond. The state's evidence tended to show that the crimes were jointly committed by

Wilson, Tommy Lerch, and Jesse Dodson. Wilson's only presentation was his sworn denial.

There were three items of evidence which tended to connect Wilson with the crime. The first was the testimony of the accomplice Dodson, who testified that Wilson participated in the killing and robbery and laughed; but he admitted that he had earlier told officers that Lerch did the killing and Wilson was not present.

The second state's item was the testimony of Pickall, from whom the district attorney hoped to elicit evidence that Wilson had confessed killing Hammond. Pickall had earlier given a written, sworn statement concerning Wilson's "confession" of the crime. That statement included the following portion: "[Several days after the crime, Wilson] came back and borrowed my bicycle to go to the grocery store. When he came back he was drinking, he told me he had taken a boy named James Olin up in some woods and killed him, he said he hit him in the head with a hammer and then he put a stick in his head. He stated Jesse was at the car and heard him scream. He was laughing and telling all about it." However, at trial all Pickall would state was that Wilson told him "that someone had got killed or he had killed somebody. I don't know to be exact." The district attorney then asked to be allowed to impeach his own witness with the previous inconsistent statement, on the ground that his testimony had "entrapped" the state under Code Ann. § 38-1801. At a conference at the bench, the district attorney admitted that he had known for some time that the witness was "wishy washy" and was "backing up" in his earlier story, but he did not know what to do except to put him on the stand and hope for the best. The court then indicated that impeachment of this witness would not be proper because the state was not actually surprised; but upon further consultation, the court changed its opinion and allowed Pickall to be impeached and the statement implicating Wilson to be introduced under instructions that it was for impeachment purposes only. When examined about the statement, Pickall testified that he had made the statement but that the facts stated therein were not confessed by Wilson but were told Pickall by one Michael Whitehead, who had talked to Pickall about the murder.

The third item of evidence was the surprise testimony of Michael Whitehead, near the end of the trial, after the district attorney stated in his place that he had only learned the previous afternoon that Whitehead could testify that Wilson had confessed to Whitehead after Wilson's arraignment, when Wilson and Whitehead were both in jail together. The trial court, considering that the district attorney claimed the evidence to be newly discovered, allowed it, and Whitehead testified even though he had not been named on the witness list provided to defendant.

Wilson was convicted and sentenced to life imprisonment for murder, and four years for armed robbery.

1. We consider first the testimony of the witness Pickall. The first section of Code Ann. § 38-1801 states that, "A party may not impeach a witness voluntarily called by him, except where he can show to the court that he had been *entrapped* by said witness by a previous contradictory statement." (Emphasis supplied.) In addition to certain requirements concerning to whom the statement may be made (see, e.g., *Jeens v. Wrightsville & T. R. Co.,* 144 Ga. 48 (85 SE 1055)), Georgia cases have placed a gloss on the term "entrapment" requiring that one desiring to impeach his own witness show both surprise and prejudice by the actual testimony as opposed to the earlier statement. E.g., *McDaniel v. State,* 53 Ga. 253, 254; *Jackson v. State,* 124 Ga. App. 488 (184 SE2d 185); *Luke v. Cannon,* 4 Ga. App. 538, 542 (62 SE 110). When impeachment is allowed, the prior inconsistent statement is admitted in evidence for impeachment purposes only. *Wisdom v. State,* 234 Ga. 650, 655 (217 SE2d 244); *Rogers v. Saye,* 106 Ga. App. 453, 455 (127 SE2d 161).

Wilson contends that the court erred in two respects in allowing the district attorney to claim "entrapment" and thus cross examine Pickall and introduce his former statement: (1) because the state was on notice that Pickall would probably not adhere to his earlier statement and was not genuinely surprised; and (2) because Pickall's testimony did not prejudice the state, but merely failed to bolster its case.

On the issue of surprise, the district attorney addressed these remarks to the court outside the jury's hearing: ". . . I do feel like I do have to tell the Court this, that I've talked to Allen Eugene Pickall after arraignment day, . . . and he indicated at that time that he was backing up on his statement, of course the only thing I can do is go ahead and just put him up, I was hoping that if he was put under oath that he would make the same statement that he had made to agent Paul Griffin and Sheriff Gary McConnell, and I have been entrapped I feel, he gave this statement, read it over and even signed it, and I think the State ought to be able to rely upon it . . . I'll say this, Your Honor, of course I want to be fair about it, . . . when I talked to him, one minute he would say he would go along with it, and the next minute he'd say well I don't know if he said he stuck the stick in his head, he would make that kind of answer so I gave up with him after talking with him I guess for some 20 minutes, I finally just gave up and told him that I was going to call him as a witness, and you know, he could either tell the truth or it would be on his conscience."

The defense passed up any opportunity to cross examine Pickall about the "backing up" he had earlier communicated to the district attorney; so the record on the extent of the state's "surprise" consists solely of the district attorney's representations to the court. He at no time indicated that Pickall had ever previously repudiated his statement that Wilson confessed the crime; the repudiation or "backing up" as he described it ran to details of the alleged "confession" only. Compare *Jackson v. State,* supra. We conclude that the state has shown adequate surprise.

A more difficult question is presented regarding prejudice. Wilson argues cogently that Pickall's testimony did not harm the state's case; it just failed to support it. We agree; and were we still convinced that their reasoning is sound, the following cases, among others, presenting analogous facts and requiring actual prejudice flowing from the testimony would control this case and require that we find error: *Beach v. State,* 138 Ga. 265, 266 (75 SE 139); *Nathan v. State,* 131 Ga. 48 (61 SE 994); *Rickerson v. State,* 106 Ga. 391 (33 SE 639). As was

written in *Rickerson* (p. 392), "The mere failure of a witness to testify to facts supposed to be beneficial to the party introducing him and which were expected to be proved by him does not come within the reason or policy of the rule [allowing impeachment]." However, in opposition to those cases stand others imposing no such stringent prejudice requirement. In *Peurifoy v. State,* 53 Ga. App. 515, 517 (186 SE 461), the Court of Appeals decided that when an attorney stated to the court that he was entrapped, "it is not error for the judge to allow [him] to cross examine and lead the witness without first subjecting [the attorney] himself to an examination." This ruling is obviously incompatible with any rule under which a showing of surprise and prejudice must first be made. Similarly, in *Young v. State,* 220 Ga. 75, 77 (137 SE2d 34), this court approved the trial court's action in allowing the state to impeach one of its own witnesses whose testimony did no harm but failed to help the state quite so much as her earlier statement to police officers. In *Young,* the court approved allowing cross examination where there was a "material conflict" between the witness' testimony and her statement. Id., p. 76. Very recently, in *Wisdom v. State,* 234 Ga. 650, supra, we allowed impeachment where the testimony was merely "inconsistent" with the prior written statement. Given this conflict in the cases, we elect henceforth to follow the *Wisdom v. State* approach, and we disapprove anything to the contrary in other cases.

We are persuaded to this view because of the palpable falseness of the rationale underlying the requirement for extraordinary circumstances before one may impeach his own witness. That rationale is usually said to be that one guarantees his witness' veracity. What that overlooks is that most often one does not choose his witnesses — he is stuck with them. Treatise writers have long deplored this old rule. E.g., 3A Wigmore on Evidence, § 896 et seq. (Chadbourn Rev. 1970). Wigmore, after tracing the obscure history of the rule against impeaching one's witness, concludes that it sprang forth full grown sometime during the 1700's and has made mischief ever since. He concludes that three reasons — none substantial — underlie the rule. One is that a party should be morally

bound by his witness' statements; the second is what he terms "the popular and canting reason" that a party guarantees his witness' credibility; and the last is that a party ought not to be able to hold a threat over a witness whose testimony he might not like. As to this third reason, which is the only one of any substance, Wigmore concludes "But, after all, it is a reason of trifling practical weight." Wigmore, supra, §§ 896-899. In short, there is no good reason for the rule.

We conclude that the ends of justice are far better served by full exposure of whatever previous statements a witness might have made if his testimony conflicts with them. We note that Rule 607 of the new Federal Rules of Evidence, 28 USCA (eff. July 1, 1975) reads in its entirety as follows: "The credibility of a witness may be attacked by any party, including the party calling him." Should anyone object that the introduction of earlier out-of-court statements could occasion confusion, we answer that it is the function of a thorough and sifting cross examination to explore the circumstances of each of the witness' pronouncements, in the ultimate quest for truth.

Henceforth, for "entrapment" under that Code Ann. § 38-1801 to exist, we will not require that the witness' testimony be a total "surprise" nor that it be affirmatively damaging. The trial court did not err in allowing the district attorney to cross examine Pickall, nor in admitting in evidence his prior inconsistent statement.

The remaining enumerations of error do not require extended discussion.

2. It was not error, in the absence of a request, to fail to charge the jury on the substance of Code Ann. § 38-1801. *Washington v. State,* 138 Ga. 370 (75 SE 253); *Hunter v. State,* 136 Ga. 103, 104 (70 SE 643); *Rogers v. Saye,* supra. The record refutes Wilson's suggestion that it was not made clear to the jury that Pickall's previous statement was to be considered for impeachment purposes only.

3. It was not error for the trial court to deny a mistrial motion made on the ground that the district attorney's question to a witness, "Did he tell you that he had gotten in a poker game and had gotten in a fight" put the defendant's character in evidence. The trial court has

a large discretion in such matters. *Bowen v. State,* 123 Ga. App. 670 (182 SE2d 134); *Brown v. State,* 118 Ga. App. 617 (165 SE2d 185). The court here instructed the jury to disregard the question, and reprimanded the prosecutor in the presence of the jury for having asked it. We find no error in denying the mistrial motion.

4. Pickall testified and was cross examined on the first day of trial. On the second day of trial the state presented a last minute witness, Michael Whitehead, whose name had not been furnished Wilson on the list of state witnesses, and who had sat in the courtroom after the rule of sequestration had been invoked. The district attorney stated in his place that this was evidence which had been discovered at approximately 6:30 p.m. the previous evening when he and an assistant district attorney conducted a further interview of Michael Whitehead. The trial court did not err in allowing this witness to testify for the state. Code Ann. § 27-1402; *Mitchell v. State,* 226 Ga. 450, 454 (175 SE2d 545); *Butler v. State,* 226 Ga. 56, 58 (172 SE2d 399).

5. The last enumeration, complaining that the evidence was not sufficient to support the verdicts and the verdicts were contrary to the weight of the evidence, is without merit. The accomplice Dodson's version of the murder and of Wilson's participation therein was required to be corroborated by Code Ann. § 38-121; and Whitehead's testimony was adequate corroboration. The armed robbery in this case was an integral part of the murder transaction and was simultaneous with it. Therefore, though it is true, as Wilson urges, that there is no independent corroboration of Dodson's testimony concerning the armed robbery, under the rationale of our recent case of *West v. State,* 232 Ga. 861 (209 SE2d 195), we rule that corroboration of the murder is adequate on these facts to corroborate the accomplice's testimony as to the entire unified transaction including the armed robbery.

Our review of the enumerated errors reveals that none is meritorious, and we affirm Wilson's convictions.

*Judgment affirmed. All the Justices concur.*

SUBMITTED SEPTEMBER 4, 1975 — DECIDED OCTOBER 28, 1975.

*William Jerry Westbrook,* for appellant.